BALTIMORE TRANSIT COMPANY *v.* ALBERT W.
BRAMBLE

[No. 2, October Term, 1938.]

*Decided November 16th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Wallis Giffen,* with whom was *Philip S. Ball* on the brief, for the appellant.

*Daniel S. Sullivan,* with whom were *Symone S. Spector* and *Daniel S. Sullivan, Jr.,* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case is from a judgment entered upon the verdict of a jury in the Baltimore City Court, in favor of Albert W. Bramble, for alleged injuries sustained by the plaintiff on September 6th, 1936, and grow-

ing out of an accident which happened in Baltimore County, at a point at which what is known as the Old Bay Road, a public highway, crosses a single track line of the Baltimore Transit Company, the appellant; which company operates an electric street car service extending into and servicing rural territory adjacent to the City of Baltimore.

At the trial below, the appellee offered testimony tending to show that on the day of the accident he was a passenger in a 1929 Cadillac sedan automobile, which was being driven from a resort known as Bay Shore toward a resort known as Bay Side; that the course between the two points is over what is commonly known as the North Point Road, until it is intersected by what is known as the Old Bay Road, and thence over the latter road across the railway track of the appellant; that the general course of the former road is north and south, and that it parallels the railroad track a short distance to the east thereof; that the course of the Old Bay Road is east and west; that it comes to a stop at its intersection with the North Point Road at a distance of from 80 to 100 feet east of the railway track, and crosses the track approximately at right angles, and that the accident happened in the afternoon of a clear day.

The appellee testified that George W. Lewis, whose guest he was, occupied the left front seat of the automobile and drove it; that Mrs. Lewis occupied the seat beside the operator, and that he and a daughter of Mr. and Mrs. Lewis occupied the right and left rear seats, respectively. He further testified that he was, at the time of testifying, twenty-four years of age; that at the time of the accident he was employed as a chauffeur, that he had been familiar with the crossing for fifteen years, and had passed it many times; that he recalled when Mr. Lewis made the turn into the Old Bay Road, which point he estimated to be 80 feet distant from the railroad track; that the aproximate width of the road was 22 feet; that Mr. Lewis was driving very slowly as he made the turn, and proceeded cautiously toward the

railroad track, stopping from 3 to 3½ feet from the east rail, from which point the operator "looked and listened," and that he did likewise. Further testifying the witness stated that the automobile was from 16 to 18 feet long and that the seat he occupied was 5 or 6 feet to the rear of the one in which the driver sat; that, from his position in the automobile, his vision as he looked to the left was cut off by a shed or garage, located south of Old Bay Road, and that looking to his right he had a clear view of from 300 to 400 yards. Detailing what happened about the instant of the impact, the appellee stated that Mr. Lewis then proceeded at a speed of from two to three miles an hour at which moment the witness first noticed a street car 50 feet distant, approaching from his left "at a terrific speed," and at about the instant when the front wheels of the automobile were first starting across the east rail of the track; that the automobile was struck about midway on the left and pushed "quite a few feet up the track" before the street car came to a stop.

According to the testimony of the appellee, dense undergrowth eight or nine feet high, and trees three-fourths the height of the trolley poles, prevailed along the east side of the track, south of the crossing, and, as the street car approached, no whistle was blown. He explained that he "took it that Mr. Lewis had taken all provisions so far as approaching. He had looked and listened, and waited, and continued across. It didn't seem necessary for me to get out and flag him on."

Notwithstanding the growth along the track to which he testified, the appellee admitted, on cross examination, that such growth was low enough to permit him to have seen the trolley wire for a distance of 180 feet south of the crossing.

In somewhat greater detail, Mr. Lewis portrayed the conditions and circumstances immediately connected with, or surrounding, the accident. His testimony bearing upon what happened just prior to the incident is as follows: "As I came to Old Bay Road, just before I

got there, I had to slow down to 6 miles an hour in order to make a right turn. I proceeded up the tracks, about 3½ to 4 feet of it; I put my car in neutral, looked to the left, and there was no car in sight, no whistle blown. I then started up my car, and as I put my first wheels over the cartrack, I looks to my left again and there was a car within 30 feet of me. I did the best thing I knew to do, and that was to get across the track, because I was in motion then, and it got me."

The witness estimated the width of Old Bay Road as being from 30 to 40 feet and described the track as being the usual "T-"Rail type, laid on cross ties; the grade at the crossing being level, and there being a railroad warning sign of the usual type to his right, which he passed as he approached the track.

According to the testimony of this witness, the automobile was to his right of the center of Old Bay Road, approximately 6 feet from the north edge thereof, and the distance from where he was sitting was from 11½ to 12 feet from the railroad track when he stopped.

When asked as to any obstructions which tended to cut off his view of the railroad, to his left, from the point at which he made the turn into Old Bay Road to where he came to a stop, Mr. Lewis stated: "There was houses, two houses, a dwelling house and then there was a garage. Between them is a distance of 30 to 40 feet, but I couldn't see because of a grape arbor between the two places, and in addition to the shrubbery, the trees from 7 to 8 feet, I judge. So it cut my view off until I got within 17 feet of the track."

He located the garage as being 17½ feet from the track and 6 feet from the south side of Old Bay Road; testified that from the point at which he stopped, he could see to his left for a distance of 100 feet, and estimated the speed of the street car as it approached as being 35 miles an hour; he was familiar with the surroundings of the crossing having passed over it a number of times. As he proceeded over the first rail of the track he was moving "at a very slow walk," he estimated

the height of the shrubbery and trees along the east side of the railroad, to his left, as being from 7 to 15 feet; the trolley poles 7 feet distant from the track stood at a height of 25 feet; the trolley wire set well above the trees and shrubbery and this was connected with a pole extending from the roof of the car; that he knew the position of a railroad "stop, look and listen" cross-arm warning sign to be either opposite his position in the automobile, when he stopped, or slightly back of his right, but did not recall that he noticed the sign on the occasion of the accident, and described the track as being practically straight for a long distance, as viewed both ways from the center of the railroad at the crossing, which he described as a dangerous one; he did not hear the sound of the street car as it approached him.

Mrs. Lewis was killed in the accident, and Miss Lewis, the remaining occupant of the automobile, in substance corroborated the testimony of the preceding witnesses as to the manner in which the accident occurred.

George Richard Labuda, seventeen years of age, was sitting on the porch of his father's store, located west of the railroad and south of Old Bay Road. From his position, which was from 90 to 100 feet from the crossing, he could see across and east of the street car track, and also a section of the track both north and south of Old Bay Road. He testified that he saw the automobile in which the appellee was riding when it made the turn into Old Bay Road; it proceeded slowly and stopped from 3 to 4 feet distant from the east rail of the track and to the right of the center of the road; he had seen the street car approaching the crossing from the south when it was 500 feet from the intersection, and stated that it was 90 feet from the crossing at the moment he saw the automobile come to a stop; he heard no signal from the street car until it was 20 feet distant from the auto-mobile, at which time he heard the motorman "push down his plunger and he kept on blowing." He esti-mated the speed of the street car at between 30 and 35 miles an hour.

According to this witness there was a car landing just south of Old Bay Road and east of the railroad of the width of 7 feet, and the growth east of and paralleling the landing was "not very high"; the length of the landing was fixed by the witness as being 60 feet.

In the course of the cross examination of this witness he was asked: "Q. After you saw the automobile stopped from three to four feet east of the easternmost rail of the railroad track, and the street car 90 feet from the crossing, that is, about 30 feet south of the landing platform, then the automobile started to make the crossing, didn't it? A. Yes, sir. Q. And kept on until the front wheels had gotten on the first rail, the nearest rail of the car track. Right? A. Yes, sir. Q. And then the street car wasn't more than about 30 feet away from it, was it? A. I judge about that. Q. And the automobile kept on going until it got squarely across the track, and then the collision occurred? A. That is right."

Albert G. Hesse, a civil engineer in the employ of the appellant, was called for the purpose of establishing distances from the scene of the accident to various points within the immediate vicinity, and also of identifying and explaining plats made by the witness and filed as exhibits in the case, as well as photographs of the scene, filed as exhibits, the photographer who took the pictures in the presence of the witness having died some time prior to the trial. The plats as verified by his testimony tend to show that the railroad is a single track of standard construction "T"-Rail, laid on cross ties and stone ballast, upon the appellant's right of way, which crosses a county highway, in practically open country; that the length of the street car landing south of the track and on the east side thereof is 65 feet and its width 7 feet; that paralleling the landing, on the east, is a clear space between the landing and a shallow ditch of from 5 to 7 feet in width, which added to the width of the landing would represent an unobstructed space of from 12 to 14 feet, extending the full length of the landing; that the northerly edge of the garage mentioned in the previous

testimony is 17 feet and 5 inches distant from the east rail of the track, and 11 feet from the southerly margin of the road; that the length of the garage paralleling the railroad is 22 feet; that the width of Old Bay Road between the North Point Road and the crossing is 22 feet; that the general topographical characteristics of the immediate vicinity of the crossing is level.

For the purpose of demonstrating the possible view to the south of Old Bay Road, which the appellant contends was available to the driver of the car in which the appellee was a passenger at the time it is alleged to have stopped before attempting to cross the track, the witness identified a plat made by him, and filed as one of the appellant's exhibits, showing a figure, representative of a Pontiac automobile, placed to the right of the center of Old Bay Road, at a point at which the bumper was 4 feet south of the east rail of the railroad, and the driver's seat was 11 feet south thereof. Measured along the line of vision, looking south, of a driver sitting in the above indicated automobile, the plat, as explained by the witness, shows that a street car, similar in type to the one involved in the accident, could have been seen by the driver, or was clearly viewable to him for a distance of 308 feet south of the south line of the crossing, including the clear view of three trolley poles.

After detailing the manner in which the above test was made, the witness Hesse continued: "Mr. Dunn, (who made the observation), was sitting in the automobile and I was standing in the road alongside, and I made the same experiment myself. I mean I got into the driver's seat in the same automobile and my result confirmed Mr. Dunn's. Taking a point 12 feet east of the easterly rail of the street car track at the side of the automobile as indicated on my plat, and projecting a line southerly, the unobstructed range of vision is, to the center of the track, about 230 feet. That would be the same experiment. * * * Now, then, laying off a point 13 feet east of the rail and projecting a line to the south along the track, the range of clear visibility would be about 200 feet."

It may be added that photographs were taken from the driver's seat in the automobile from which the above tests were made, and introduced in evidence in support of the testimony of the witnesses who participated in their production, and that these photographs amplify and tend to confirm the testimony adduced to establish the range of vision which was available to the driver of the automobile, immediately preceding the accident, when considered with reference to the respective distances, south of the track, referred to in the testimony of the engineer of the appellant. It was also testified by the engineer that any variance between the height of the Lewis automobile and that of the test car, or variance in the position of the respective cars on the road, provided, of course, they were placed the same distances, respectively, south of the east rail of the track, would make practically no difference in the visibility of the driver. Or that a difference of twelve inches in vertical height between the eye level of the respective drivers sitting in the front seats of the Lewis or test automobiles would make any difference in the angle, range or distance of vision.

It was further testified by the witness Hesse that a driver sitting in the test automobile in a position 11 feet south of the north edge of the Old Bay Road and 20 feet east of the east rail of the railroad would have an unobstructed view to the center of the railroad for a distance of 127 feet south of the edge of Old Bay Road.

John E. Metzbower, claim investigator of the appellant, testified that on March 2nd, 1937, with the same street car which was involved in the accident, in normal condition, operated over a course 1320 feet south of the south side of Old Bay Road, starting 300 feet below the course, and with the motorman operating the car at its full power, the maximum speed obtained was 25.3 miles per hour. Other similar tests, made on the same day with a 600 foot start below the course, developed a maximum speed of 27.3 miles per hour.

Edward J. Dunn, who sat in the test car when the observations and measurements to which reference has here-

tofore been made were taken, substantially corroborated the testimony of Mr. Hesse, and there is testimony found in the record which tends to show that the conditions of the track when the speed of the street car was tested, and the electric current available for motive purposes at that time, were the same on the day of the test as they were on the day of the accident.

Finally, the testimony of the motorman and conductor of the street car, who were the only two persons on it when the accident occurred, is to the effect that the whistle—two long and two short blasts—was blown at the regular whistle post between crossings,—a point approximately 500 feet from the scene of the accident, and at other intervals before reaching the crossing; that at the time of giving the signal the car was slowed down from a speed of 15 miles an hour; that 90 feet distant from the crossing the whistle was blown; that the motorman saw the automobile approaching the track at a rapid speed when the car was 45 feet from the edge of the crossing; that he was then going about 10 miles an hour and at that instant applied his brakes and again gave the signal; that when the car was practically at the crossing the automobile was 10 feet south of the same and continued its course directly in front of the car at the same speed; that the emergency brakes were promptly applied, but the force of the impact caused them to burst, whereby the air was released from them and control of the car was lost—it came to a stop 85 feet north of the point of impact.

Explaining the reason for continuing past the crossing without coming to a stop, the motorman added: "When I approached Bowers Station, (meaning the crossing in question), there was nobody on the landing platform waiting to get on my car or to get off; there wasn't any occasion on account of passengers to stop my car at that crossing; I didn't have any passengers on my car and there wasn't anybody to board my car; it was only me and the conductor on the car." This witness described the track as being "straight for a mile."

During the course of the trial below, ten exceptions were reserved by the appellant to the court's rulings upon the evidence, and one to its ruling on the prayers. The first, second, third, sixth, and eighth exceptions to the rulings on evidence were abandoned in this court, and because of the conclusion we have reached in disposing of the exception to the action of the trial court upon the demurrer, prayers offered by the appellant, it will be unnecessary to consider the questions raised by the remaining exceptions.

The "A" prayer offered by the appellant was a general demurrer to the evidence, and was properly refused. 2 *Poe, Pl. & Pr.* sec. 295; *Moyer v. Justis,* 112 Md. 220, 76 A. 496; *Taxicab Co. v. Emanuel,* 125 Md. 246, 93 A. 807. And in disposing of the "B" and "C" prayers offered by the appellant, we are of the opinion that the trial court was also correct in its rulings rejecting them. They both were based upon the theory of contributory negligence on the part of the appellee, who, as has been noted, was a passenger in, and not the driver of, the automobile involved in the accident which resulted in injury to the appellee.

It will be recalled that, in disposing of a recent appeal of the defendant company, wherein George W. Lewis, the driver of the automobile in the instant case, was plaintiff, and wherein the physical conditions surrounding the accident were the same, and, with slight variance in the testimony, the facts then before us were similar to the facts developed in the case now under consideration, this court reversed a judgment in favor of the plaintiff, without a new trial, upon the ground that there was error in the ruling of the trial court in rejecting a prayer directed to the contributory negligence of the plaintiff. *Baltimore Transit Co. v. Lewis,* 174 Md. 618, 199 A. 879. The obvious distinction between the cited case, and the case now before us, is the fact that in the former case a driver was plaintiff, and in the latter a passenger who was an invited guest is plaintiff.

It is equally obvious that the same degree of vigilance

and caution in the direction and control of an automobile is not applicable to a passenger or invited guest as that to which the driver is held. And while the appellant, both in the oral argument made on its behalf in this court, and in its printed brief, stresses the point that the appellee here is chargeable with contributory negligence, we cannot say, as a matter of law, under the facts before us, that he was so chargeable. It is true that the evidence in the case tends to show that the appellee is an experienced chauffeur, who was well acquainted with the crossing and the locality in which the accident happened, and, to that extent, greater scrutiny as to his conduct immediately preceding the accident should be applied in determining the question *vel non* of his negligence. But it is also true that he occupied the right rear seat of the automobile, and that the uncontradicted evidence is that one's vision along the track both ways was relatively minimized, as the point of view south of the track was extended south.

The jury may have concluded, from all the testimony before it, that the appellee was justified in relying upon the carefulness of the driver, who, as the evidence tends to show, was also well informed of the physical surroundings, and who, according to the testimony of the plaintiff, from a more advantageous point of vision, "had looked and listened, and waited, and continued across."

The appellee affirmatively testified that the approach to the railroad was made while the automobile was moving slowly; that from his position in the same he could not see in a southerly direction along the track, and did not see the street car until after Mr. Lewis had driven the automobile from a point of safety to one of danger, when the car was but fifty feet from him. It was too late then for him to have warned the driver with any effective result, and while his confidence and trust in the alertness and carefulness of the operator may have been misplaced, we are unwilling, under the state of facts above indicated, to hold that the negligence of the latter can be imputed to the appellee, notwithstanding that it would seem in-

credible that he did not hear the noise of an empty street car approaching the crossing at the high rate of speed to which he testified.

In *Kelly v. Huber Baking Co.*, 145 Md. 321, 125 A. 782, it is said: "The rules of law which allow courts to determine the existence of contributory negligence as a matter of law have been so often and so clearly stated and are so well settled that anything more than a reference to some of the recent cases in which they have been discussed is unnecessary and from them this general principle has been deduced; that is: 'That the act relied on to establish as a matter of law the existence of contributory negligence must be distinct, prominent, and decisive, and one about which ordinary minds would not differ in declaring it to be negligent. Where the nature and attributes of an act relied on to show negligence, contributing to an injury sustained, can only be determined correctly by considering all the attending and surrounding circumstances of the transaction, it falls within the province of the jury to pass upon and characterize it, and it is not for the court to determine its value as a matter of law." *B. & O. R. Co. v. State, use of Hendricks*, 104 Md. 76, 79, 64 A. 304; *McCarthy v. Clark*, 115 Md. 454, 468, 81 A. 12; *National Life Ins. Co. v. Fleming*, 127 Md. 179, 185, 96 A. 281; *Baker v. Maryland Coal Co.*, 84 Md. 19, 27, 35 A. 10; *Waltring v. James*, 136 Md. 406, 407, 111 A. 125; *Riley v. State*, 140 Md. 137, 143, 117 A. 237; *Rosenthal v. Durkin*, 142 Md. 18, 20, 119 A. 685; *Brown v. Patterson*, 141 Md. 293, 118 A. 653; *Merrifield v. Hoffberger Co.*, 147 Md. 134, 136, 127 A. 500; and *Taxicab Co. v. Emanuel*, 125 Md. 246, 93 A. 807.

In the case of *Baltimore, C. & A. Ry. Co. v. Turner*, 152 Md. 216, 136 A. 609, in which the plaintiff was a passenger, and in which the above defense was urged by a defendant railway company in a suit brought against it for alleged injuries received by the plaintiff, growing out of a collision between an automobile and a locomotive at a country crossing, this court, speaking through Judge Offutt, said:

"Acts or omissions which might amount to gross negligence on the part of the driver of an automobile might not be negligent at all on the part of a passenger therein, because ordinary care would require the driver operating such a potentially dangerous vehicle as an automobile on a public highway to exercise a more constant and intense vigilance to detect danger and to avoid injury to himself or others than could reasonably be expected or required from a mere passenger. One riding, whether as an invited guest in a private car or as a passenger in a public conveyance, such as a taxicab, cannot under all circumstances be expected to be constantly on the lookout for possible danger, and to distract and confuse the driver by a steady flow of warning admonitions, but he is entitled to rely to some extent at least upon the vigilance of the driver, if he appears to have ordinary skill and experience. If, however, the passenger knows, or should as a reasonably cautious and prudent person know, that danger may follow the operation of the car in a particular manner or in a particular course, it is his duty to take such measures as may be open to him to avoid it, and he is guilty of negligence if he fails to do so. And the place which a passenger occupies in an automobile is also important in determining whether he exercised reasonable care and prudence to detect and avoid danger, for one on the front seat with the driver may have a far better opportunity of discovering any danger ahead in the course of the car, than one in the back seat. And whether under the circumstances of a given case the failure of a passenger to discover danger and to do what he can to avoid it is negligence or not is usually a question for the jury." See also *Lozzi v. Pennsylvania R. Co.*, 152 Md. 508, 137 A. 293; *Barker v. Whitter*, 166 Md. 33, 170 A. 578; *Glick v. Cumberland & W. Elec. Ry. Co.*, 124 Md. 308, 92 A. 778; *Crystal v. Baltimore & Bel Air Elec. Ry. Co.*, 150 Md. 256, 132 A. 629; *McNab v. United Rys. & Elec. Co.*, 94 Md. 719, 51 A. 421; *Balto. & O. R. Co. v. State, use of McCabe*, 133 Md. 219, 104 A. 465; *Dorchester*

*County v. Wright,* 138 Md. 577, 114 A. 573; *State v. Nor-folk & West Ry. Co.,* 151 Md. 679, 135 A. 827.

For the reasons stated, as hereinbefore indicated, our conclusion is that the contributory negligence of the driver, which was decisive in the *Lewis* case, cannot, under the facts before us, be imputed to the appellee in the instant case.

By its "D" prayer, the defendant sought an instruction that it appeared from the uncontradicted evidence that the last negligent act and proximate cause of the accident was the negligence of the driver of the automobile, and by its "E" prayer, an instruction that from the uncontradicted evidence the failure of the driver to exercise ordinary care and skill under all the circumstances, for the care and safety of the appellee, was the direct and proximate cause of the accident, without which it would not have occurred.

Both of the latter prayers were rejected, and as it is urged by the appellant that the trial court's action in this respect was erroneous, it becomes necessary to dispose of the questions raised by these rulings.

The established principle is that to entitle the plaintiff to recover in an action of this kind, he must show not only that he has sustained an injury, but he must also show that the defendant, without the plaintiff's contribution thereto, has been guilty of some negligence which produced or contributed to that injury. "The negligence alleged, and the injury sued for, must bear the relation of cause and effect." *Benedick v. Potts,* 88 Md. 52, 40 A. 1067, 1068, 41 L. R. A. 478.

The application of the doctrine of proximate cause to the facts in a given case is not always without difficulty. But the general rule is that, where the injury to the plaintiff is the result of concurring causes, the question is one which should be submitted to the jury; unless, however, the evidence discloses a state of facts showing no connection between the injury and the negligence charged, except the bare possibility that the former resulted from the latter, or an uncontroverted state of

facts establishing an efficient intervening cause which would preclude the defendant's act from being the proximate cause of injury.

In *Berry on Automobiles* (4th Ed.) sec. 221, it is said: "Where two or more tort feasors by concurrent acts of negligence, which although disconnected in combination inflict injury, they may be sued jointly or severally * * * If each contributes to the wrong, the proximate cause is the wrongful act in which they concurrently participate." The principle, as stated in 45 *C. J.* 920, 923, is: "As a general rule, it may be said that negligence, to render a person liable, need not be the sole cause of an injury. It is sufficient if his negligence concurring with one or more efficient causes other than the plaintiff's fault, is the proximate cause of the injury. So that where several causes combine to produce injuries, a person is not relieved from liability because he is responsible for only one of them, it being sufficient that his negligence is an efficient cause, without which the injury would not have resulted to as great an extent, and that such other cause is not attributable to the person injured."

As viewed by the above standard of liability, the questions which now confront us are: (a) Whether the record reveals a state of facts from which the jury might have concluded that the appellant was negligent? and (b) Whether such negligence, if any, was either the proximate or one of the contributing causes of the accident resulting in injury to the appellee?

As has been noted, the scene of the accident was at a crossing in open country territory, over a private right of way and railroad track, owned and operated by the appellant. The settled law of this state is that where a railroad traverses open country on a private right of way, over a track constructed for the passage of trains of high speed, a train has the right of way at a highway crossing and negligence is not to be inferred from the fact that it travels at a high rate of speed when it approaches such crossing. *Klein v. United Rys. & Elec.*

Co., 152 Md. 492, 137 A. 306; *Crystal v. Baltimore & Bel
Air Elec. Ry Co.,* 150 Md. 256, 132 A. 629; *United Rys. &
Elec. Co. v. Crain,* 123 Md. 332, 91 A. 405. The duty of
those using the highway crossing, and those oper-
ating the railroad train, are mutual and recipro-
cal, and not confined to one party only, and while from
the very nature of the situation railroad trains have the
precedence of passing the crossings of public highways
unobstructed, it is, nevertheless, the duty of those oper-
ating the train to exercise care in directing the same
to give proper and sufficient signals of their approach,
and to take all reasonable precaution, in view of the
nature of the crossings, to avoid collision. Conceding,
therefore, under the authority of the above cited cases,
that the appellant had the unquestioned right of way,
the next inquiry which naturally follows is whether,
under the state of the record in this case, it exercised
its right in conformity with the duty incumbent upon it?

Briefly, on the one hand, the testimony on behalf of
the appellant tends to show that the street car on the·
occasion of the accident was operated with reasonable
speed and in careful manner, and that successive warn-
ings of approach to the crossing were given by sounding
the whistle, in line with the usual and ordinary routine
followed in the management of the car; and, on the
other hand, the testimony on behalf of the appellee tends
to show that the street car was operated at the rate of
thirty-five miles an hour and also at a "terrific speed,"
and that no signals or warnings whatever were given,
until at the instant of the impact. The latter testimony,
it may be added, being sponsored mainly by occupants
of the automobile, who could have observed the signal
had it been given, and who, because of the known posi-
tion of danger in which they were at the time placed,
naturally suggested that for their own safety and pro-
tection they would look and listen for the warning or
signal of danger. *Northern Central Ry. Co. v. State,
use of Gilmore,* 100 Md. 404, 60 A. 19; *United Rys. &
Elec. Co. v. Crain, supra.*

In the recent case of *Klein vs. United Rys. & Elec. Co.*, 152 Md. 492, 137 A. 310, wherein some of the facts in the case bear striking analogy to the facts now before us, it was said: "Nor can negligence be inferred from the fact that the train was moving at a 'terrific' speed, whatever that indefinite and uncertain expression may mean, or that it was going at the rate of thirty-five miles an hour, because the mere running of a train at a high speed over a country crossing is not in itself evidence of negligence (*Balto. & O. R. Co. v. Black*, 107 Md. [642] 662, 69 A. 439, 72 A. 340), and it is a matter of general knowledge that cars, whether propelled by electricity or steam, may and do operate at higher speeds in the open country than on city streets." *Westerman v. United Rys. & Elec. Co.*, 127 Md. 225, 231, 96 A. 355; *Sparr v. United Rys. & E. Co.*, 114 Md. 316, 321, 79 A. 585; *McNab v. United Rys. & E. Co.*, 94 Md. 719, 727, 51 A. 421.

But while negligence may not be inferred merely from the speed at which the car was operated, nevertheless, if believed, there is evidence legally sufficient for the jury to have found that, at the time of the accident, the appellant had failed in its duty to give the usual and necessary signals of the approach of the car to the crossing, and that such failure constituted an operative, proximate, and efficient cause, directly contributing to the injury sustained by the appellee. *Balto. & O. R. Co. v. State, use of McCabe, supra; State v. Norfolk & Western Ry. Co., supra.*

For the reasons stated, in our opinion, the "D" and "E" prayers of the appellant were properly refused by the trial court, and, finding no reversible error in its rulings, the judgment will be affirmed.

> *Judgment affirmed, with costs to the appellee.*